VIRGINIA IRON, COAL AND COKE COMPANY V. STANBERRY.

September 9, 1915.

1. DEMURRER TO EVIDENCE—*Doubtful Conclusions from Evidence.*—
   Where fair-minded men may differ as to the alleged contribu-
   tory negligence of a plaintiff, it is a question for the determi-
   nation of the jury, and, on a demurrer to the evidence, to be
   decided in favor of the demurree.

2. MASTER AND SERVANT—*Incompetent Servant—Knowledge of Fel-
   low-Servant—Assumption of Risk—When Not Matter of Law.*
   Where a master knowingly employs an incompetent servant,
   or keeps him in service after such knowledge, it cannot be
   said, as a *matter of law,* that a fellow-servant who also knows
   of his incompetency and remains in the service, thereby as-
   sumes the risk and is barred of recovery against the master
   for an injury inflicted on him resulting from the negligence
   of such incompetent servant. The duty of the fellow-servant
   is not to be determined by the single fact of his knowledge of
   the danger he incurred by continuing to serve with a co-
   employee known by him to be an unfit and incompetent per-
   son. It is for the jury to say from all the attending circum-
   stances whether his failure to refuse to work was contribu-
   tory negligence. The circumstances may be such that the fel-
   low-servant might still reasonably be regarded, even at the
   risk of injury to himself, as under a duty not suddenly and
   instantly to refuse to continue in the conduct of his master's
   business.

Error to a judgment of the Circuit Court of Wise county
in an action of trespass on the case. Judgment for the
plaintiff. Defendant assigns error.

*Affirmed.*

The opinion states the case.

*F. A. Groseclose, D. D. Hull, Jr., Vicars & Peery, Bullitt & Chalkley* and *Jackson & Henson,* for the plaintiff in error.

*Wm. H. Werth, E. M. Fulton* and *Bond & Bruce,* for the defendant in error.

WHITTLE, J., delivered the opinion of the court.

The defendant in error, T. C. Stanberry, sues to recover damages for personal injuries sustained by him in the service of the plaintiff in error while bonding an electric track in the main entry of one of its coal mines.

There are two counts in the declaration, but the first count was not discussed or relied on and need not be further noticed.

Plaintiff analyzes the remaining count as follows: It "alleges two grounds, either of which independently, or both concurring and operating together, was the proximate cause of the accident: (a) That defendant 'required its said trips of cars to run over said track while said work was being done,' and that the 'nature of the work . . . made it necessary that trips should be run over that part of the track with *extra caution and care by the motorman.*' (b) That the motorman was 'reckless and habitually negligent and incompetent,' and defendant had notice and knowledge of that fact, and that at the time and place in question he ran his trip over the track at reckless speed;" that one of the cars was derailed and jerked to the side of the track where the plaintiff was caught and rolled between the side of the derailed car and the rib of the entry and the injuries of which he complains were thereby inflicted.

Divested of non-essential matter, the principal facts are these: At the time of the accident the plaintiff with two other employees—Jim Colvert, white, and Julius Blackwell,

colored—were bonding the track in the main entry of the mine, about one mile from the entrance. To bond a track, we are told, means to connect the ends of the rails with a "strand bond" of copper wires, thus giving a return current of electricity through the motor and back to the power house. It is necessary to remove the fish-plates to do this work. The fish-plates connect the joints of the rails and bind them together. By means of an electric machine drill holes are bored in the ends of the steel rails into which the ends of the "strand bond" are forced by another appliance; and when the fish-plates are replaced to hold the joints of the rails in position, the work is completed. The drill weighs over one hundred pounds and two men are necessary to lift it on and off the track to allow cars to pass and to carry it from one joint in the rails to another. The operator occupies a seat attached to the drill, and applies the power by turning the feed screw. Plaintiff was acting under orders from the defendant not to obstruct the passage of cars any more than was necessary and to suffer them to pass during the progress of the work. This increased the danger of operation, and imposed upon the motorman the duty of exercising a higher degree of care in running the cars to guard against derailments.

On the instant occasion, the plaintiff had finished bonding a joint, but had not yet replaced the fish-bar or removed the machine drill from the track, when he heard the engine approaching from toward the mouth of the mine, and Blackwell was sent down the track to flag the motor, which was pushing a trip of five empty cars. The signal was given and the cars were stopped in sight of and within fifty or seventy-five feet from where plaintiff and Colvert were at work. The motorman comprehended the situation and the necessity for the stop signal, and saw the men remove the drill from the track to give him the right to pass, though he says he did not know at the time

108

that the fish-bar had not been replaced. Immediately after clearing the track, plaintiff requested Colvert to signal the motorman to "come ahead slow and steady," but he only gave the signal to "come ahead," and immediately fled from this place of danger to an open breakthrough, a place of safety. Subsequent events may best be stated in plaintiff's own language: "As they started to come ahead the drill we had once laid out of the way rolled back. I hesitated a little and went to get the drill out of the way to keep them from tearing it up with the cars—it rolled back close enough for the cars to hit it. I turned it over and broke for the breakthrough on the right hand side and ran up to it, and the breakthrough being full of gob, walled up in front with rock, it slid me back to the track. I was too close to the track then, I was standing about the end of the ties, I leaped over the track and threw my eyes back and saw the end of the second car hanging out and I knew it was wrecked, and I broke to running by the first car, it passed without wrecking. I ran by it until they overtook me, and a bolt in the car hanging out caught me in the back of the coat and whirled me against the rib and cut my face," etc. His arm and rib were broken and other injuries inflicted upon him. Plaintiff did not know that the breakthrough in which he hoped to find safety had been filled in and walled up, and if it had been open it would have afforded the only available place of refuge in the emergency in which he was placed.

The motor was running at maximum speed, twelve miles an hour, and overtook plaintiff, who, as he states, was running for his life. The first car passed the joint from which the fish-bar had been removed in safety, but the remaining four cars derailed. The motor stopped at the point of the accident and remained on the track. The company knew that the motorman was reckless and habitually negligent

and incompetent, and the plaintiff had heard those matters discussed among the employees.

It is manifest from the foregoing summary of facts that the flagrant negligence of the motorman was the proximate cause of the accident. On the other hand, as fair-minded men might have differed as to the alleged contributory negligence of the plaintiff, upon familiar principles, that was a question for the determination of the jury, and on a demurrer to the evidence must have been decided in favor of the demurree.

The question is this: Where a master knowingly employs an incompetent servant, or keeps him in service after such knowledge, does the doctrine of assumption of risk apply to a plaintiff (a fellow servant) whom the evidence tends to show also knew of such incompetency, and bar a recovery for injuries resulting from the negligence of the incompetent servant?

We are unwilling to apply that doctrine, *as matter of law,* to the facts of this case. Without going into details of the evidence affecting the questions of assumption of risk and contributory negligence on the part of the plaintiff in remaining in the service of the company with such knowledge as he may have possessed of the motorman's incompetency, we have no hesitancy in holding that it involved a question of fact to be submitted to the jury on proper instructions rather than one of law to be determined by the court.

The correct rule in such a case is clearly stated by Mr. Justice Mathews in *Northern Pacific Railway Co.* v. *Richard Mares,* 123 U. S. 710, at p. 720, 8 Sup. Ct. 321, at p. 326, 31 L. Ed. 296, at p. 301, as follows: "We think the court was clearly right in refusing to give the peremptory instruction asked for by the defendant, that if the plaintiff knew or even had the opportunity of knowing, before his fall from the car in question, that Bassett was

an unfit or unsafe man to run the engine in question, it was the plaintiff's duty absolutely to refuse to work with him any longer, and that his failure to do so would prevent him from recovering in this suit. The duty of the plaintiff is not to be determined by the single fact of his knowledge of the danger he incurred by continuing to serve with a co-employee known by him to be unfit and incompetent person. It was enough for the court to say, as it did, that a failure on the part of the plaintiff to refuse to work, in view of that knowledge on his part, might be negligence on his part. The qualification was correct, that it was for the jury to say from all the attending circumstances whether his failure to do so was contributory negligence. A suitable judgment on that question can only be reached by carefully weighing the probable consequences of both courses of conduct, and it might well happen that at the risk of injury to himself, occasioned by the unskilfulness of his co-employee, the plaintiff might still reasonably be regarded as under a duty not suddenly and instantly to refuse to continue in the conduct of the business of his principal."

So, in *Laning* v. *N. Y. Cent. R. Co.* 49 N. Y. 521, 10 Am. Rep. 417, at p. 426, Folger, J., upon a review of the authorities, held that "Knowledge in such a case is not of itself, in point of law, an answer to the action." And the refusal by the trial court to give an instruction to that effect was upheld. See also 26 Cyc. 1481 and cases cited.

The principal case cited by the defendant for the contrary view is *Frazier* v. *Penn. R. Co.*, 38 Pa. 104, 80 Am. Dec. 467. The court there seems to rest its decision on the ground of waiver. In a footnote to that case, quoting from *Pittsburg, &c. Ry. Co.* v. *Ruby*, 38 Ind. 314, 10 Am. Rep. 111, it is said: "This case stands alone, unsustained and unsupported, so far as we have been able to discover, by any

elementary work or decision. Nor can the decision be sustained in reason or on principle."

However that may be, in our judgment the principle enunciated in *Northern Pacific R. Co.* v. *Mares, supra,* is the sounder doctrine and more in accord with decisions of this court in analogous cases.

We find no error in the judgment appealed from, and it must be affirmed.

*Affirmed.*